IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**JOE CASTILLO,**

      **Plaintiff,**

v.                                                               No. 21-cv-00258-DHU

**RUDY HALE,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Rudy Hille's (*hereinafter* "Defendant") Motion for Summary Judgement requesting Dismissal of Excessive Force Claim Based on Qualified Immunity. Doc. 49. Having considered the briefing, the record of the case, and applicable law, the Court **DENIES** Defendant's Motion.

## I.
## FACTUAL BACKGROUND[1]

### A. Dispatch and Investigation by Officers[2]

On March 4, 2018, Defendant was dispatched to the Hobbs Family Inn, in Hobbs New Mexico, in reference to an unwanted subject at the hotel. UMF ¶ 1, Doc. 49. A female called dispatch and advised that she had locked the doors to the hotel and a Hispanic male tried to make entry, was circling the hotel, and appeared "high." *Id*. at ¶ 2. Dispatch then advised officers that

---

[1] The following facts are either undisputed or construed in the light most favorable to Plaintiff as the summary judgment nonmovant. *See Simms v. Okla. Ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (The Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.").

[2] AXON body cameras worn by City of Hobbs Police Department officers recorded the events on March 4, 2018. The Court describes the facts "in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), and construes any recordings gaps and uncertainties in the light most favorable to Plaintiff. *See Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1207 (10th Cir. 2017).

1

the subject was a Hispanic male who tried to make entry into the hotel. *See id*. at ¶ 3. Defendant was advised that the subject had run towards the Allsup's convenience store located nearby. *See id*. at ¶ 4. Defendant, along with a second officer, Officer Jerry Hawkins (*hereinafter* "Officer Hawkins"), responded to the Allsup's convenience store. *See id.* at ¶ 5. Officers spoke to individuals at Allsup's to locate the subject with "a red striped shirt carrying a plastic bag." *Id.* at ¶ 6-7. Defendant radioed Officer Hawkins and asked him to check the restroom. *See id.* at ¶ 6-7. Officer Hawkins checked the restroom and observed that it was occupied by a male. Officer Hawkins relayed this information to Defendant. *See id.* at ¶ 8. The officers waited outside of the restroom for the male to exit. *See id.* at ¶ 9. Officer Hawkins opened the door to the restroom as the subject, Joe Castillo (*hereinafter* "Plaintiff") was exiting. *See id.* at ¶ 10.

### B. Investigatory Detention of Plaintiff

Officer Hawkins introduced himself and instructed Plaintiff to "hold on." *Id.* at ¶ 11. Defendant placed his right hand on Plaintiff's left shoulder to have him stand and speak with the officers and Plaintiff moved his left arm up in objection. *See id.* at ¶ 12. Defendant instructed Plaintiff to not walk away, and Plaintiff advised that he would not. *See id.* at ¶ 13. Officer Hawkins explained the reason for the contact. *See id*. at ¶ 14. Plaintiff acknowledged he was at the Hobbs Family Inn and began explaining his interaction with a female at the hotel and how he got to the Allsup's. During the interaction Plaintiff was unable to remain still. *See id*. This information coincided with the information received by Defendant from dispatch. *See id.* at ¶ 15. At the request of Officer Hawkins, Plaintiff identified himself with his name and date of birth. *See id.* at ¶¶ 16-17. Officer Hawkins then radioed dispatch, asking them to run Plaintiff's name and date of birth. *See id.* at ¶ 18. Officer Hawkins again explained the reason for the contact and Plaintiff acknowledged that he understood, made a seemingly incoherent statement, and stated he

"respect[ed]" what officer Hawkins was telling him. *See id.* at ¶ 19. Officer Hawkins instructed Plaintiff to walk outside of the Allsup's with him and Plaintiff agreed, grabbed his bag, and began walking in front of Officer Hawkins toward the front door of the store. *See id.* at ¶ 20. Defendant walked through an aisle of Allsup's next to the aisle where Plaintiff and Officer Hawkins walked. *See id*. at ¶ 21. Defendant came out of the aisle on the left side of Plaintiff. *See id.*

At the time of the events giving rise to this action, Plaintiff had three outstanding warrants for felony probation violations. *See id.* at ¶ 23. Plaintiff was aware of his outstanding warrants. *See id.* at ¶ 24. It is disputed whether, on the way to the front door of the Allsup's, Officer Hawkins received a response from dispatch asking if the radio was "cleared" which Officer Hawkins understood to mean that Plaintiff had a warrant for his arrest. *See id.* at ¶ 22.

While walking to the front door of the Allsup's, Plaintiff looked back and saw where Officer Hawkins was in proximity to himself. *See id.* at ¶ 25. Plaintiff turned around and kept walking towards the front door as Officer Hawkins stated, "Hey Joe. Do me a favor and hold on for just a second Joe." *Id.* at ¶ 26. Defendant heard Officer Hawkins' command and stepped to the left side of Plaintiff and extended his left arm in front of Plaintiff to stop him from leaving. *See id.* at ¶ 27.

### C. Arrest of Plaintiff and Use of Force

It is disputed whether Plaintiff used his right hand to push Defendant's left arm away from his body, and whether Plaintiff tried to run out of the front door of the Allsup's. *See id.* at ¶ 27. Plaintiff contends that he was merely "recoiling" from being "grabbed" by Defendant without warning, and the reaction caused him to face backwards and fall to the ground. AMF ¶¶ J-L, Doc. 52. At that time, Plaintiff was moving toward and through the door. Defendant used his left hand to grab Plaintiff by his shirt and used his right hand to attempt to grab Plaintiff around the

back of the head. Defendant also placed his right leg in front of Plaintiff's body. UMF ¶ 24, Doc. 49. As Plaintiff was moving through the front door, Defendant lost his hold. *See id.* at ¶ 30. Both officers went to the ground just outside the front door. *See id.* at ¶ 31. Defendant commanded Plaintiff twice to: "put your hands behind your back." *id.*

The facts pertaining to the ensuing struggle between the officers and Plaintiff is largely disputed and described in detail in the parties' briefing. However, after both officers went to the ground in an initial attempt to control Plaintiff, Plaintiff asked "[g]uys, come on man, what did I do?" AMF ¶ O, Doc. 52. Shortly thereafter, Defendant exclaimed that Plaintiff bit him. UMF ¶ 33, Doc. 52. With Officer Hawkins still on the ground trying to control Plaintiff, Defendant drew his department issued taser. *See id.* Ex. G, 0:12:15–0:12:19. Plaintiff was able to get back to his feet while still entangled with Officer Hawkins, hopping on one foot and leaning on Officer Hawkins to avoid being thrown back down to the ground. *See id.* Ex. G, 0:12:15–0:12:22. Shortly thereafter, Officer Hawkins was able to bring Plaintiff back down. *See id.* Defendant determined that due to Plaintiff's strength, he and Officer Hawkins were not going to be able to physically control Plaintiff with just their hands and Defendant felt he needed to respond to Plaintiff's level of aggression with his taser. *See id.* at ¶ 36. Officer Hawkins gave Mr. Castillo the verbal command to "stop fighting" to which Plaintiff responded by asking the officers to quit. *Id.* Ex. G. 0:12:13–0:12:19. Defendant then gave Plaintiff the verbal warning of "taser, taser." *Id.* at ¶ 38. Plaintiff and Officer Hawkins continued to fight on the ground and Officer Hawkins gave Plaintiff the command to "stop fighting" two more times. *Id.* at ¶ 39.

Officer Hawkins eventually rolled on top of Plaintiff, while Plaintiff had his right arm around the back of officer Hawkins' neck. *See id.* at ¶ 41. Defendant instructed Plaintiff to put his hands behind his back. *See id.* at ¶ 42. Defendant tried to grab Plaintiff's left arm, but Plaintiff

4

pulled away while telling officers to "quit." *Id*. Defendant warned Officer Hawkins that Plaintiff was going to try to bite him. *See id.* at ¶ 43. Officer Hawkins continued to instruct Plaintiff to "stop fighting" and to "turn around." *Id.* at ¶ 44. Defendant warned Plaintiff again that he was going to get tased, and told Officer Hawkins that Plaintiff would try to bite him. *See id.* at ¶ 45. Plaintiff gnashed his teeth at Officer Hawkins while Officer Hawkins continued to instruct Plaintiff to stop fighting. *See id.* at ¶ 48.

At this time, Defendant placed his taser on the clothed inner thigh of Plaintiff and deployed a drive stun that lasted approximately two seconds. Defendant simultaneously gave Plaintiff the instruction to "stop fighting" and "turn over." *Id.* at ¶ 49, Ex. G 0:12:43–0:12:46. After being tased the first time and being told to turn over, Plaintiff exclaimed "okay!" and began to turn his body over onto his stomach facing the pavement. *Id.* at ¶ 50, Ex. G 0:12:45–0:12:50. When Plaintiff began to roll over, he was pinned under Officer Hawkins' body. AMF ¶ T, Doc. 52. Ex. G 0:12:45–0:12:55. Plaintiff continued to make straining sounds under Officer Hawkins weight as he attempted to turn over. *See id.* at ¶ U. From this point forward, both officers stopped telling Plaintiff to "stop fighting" or "stop resisting." Instead, Defendant began ordering Plaintiff to: "put your hands behind your back or you're going to get tased again." *Id*. at ¶ V. At this time, Plaintiff's hands were being pinned down to the pavement by Officer Hawkins. *See id*. at ¶ W, Ex. D at 0:08:12–0:08:40. Plaintiff shouted "Hey! Help!" *Id*. at X, Ex. D at 0:08:12–0:08:40. In an effort to put his hands behind his back as he was ordered to do, Plaintiff raised them up from the pavement. *See id*. at ¶ Y.

Defendant admitted in his deposition that he could not explain how Plaintiff was supposed to put his hands behind his back while his arms were pinned to the ground or how "how anybody would be able to turn over with a 200-plus-pound police officer on their chest holding their bicep

5

or wrist." *Id*. at ¶¶ Z, CC, Ex. 2 at 37:25-38:5, 39:3–7. Defendant also admitted in deposition that in order to roll over, Plaintiff had to push against Hawkins' body. *See id*. at ¶ AA, Ex. 2 at 53:13–21. Additionally, Defendant could not answer whether Plaintiff was able to comply with officers' order to turn over. *See id*. at ¶ BB, Ex. 2 at 38:21–39:2.

During the physical altercation, which lasted approximately two minutes, Plaintiff was tased by Defendant a total of seven (7) times. *See id*. at ¶ A, Ex. G. at 0:12:02–0:14:06. Throughout the entire encounter officers continuously ordered Plaintiff to "stop fighting," "roll over," and "put your hands behind your back." *Id.* Ex. G at 0:12:02–0:14:06. In response Plaintiff made statements consisting of, "ok," "quit," "stop please," "help me," and "they're killing me, por favor." *Id*. While on the ground, Plaintiff continued to move his arms, hands, and head until he was eventually cuffed. *See id.* Lapel footage shows multiple instances during the encounter where Plaintiff tried to cover the areas where he had been tased. *See Id.* Ex. G at 0:13:05, 0:13:13, 0:13:26, and 0:13:31. The physical encounter ended after Defendant deployed his taser in "dart mode," which caused Plaintiff to freeze. *See id.* Ex. G at 0:13:42. With Plaintiff immobilized, Officer Hawkins was able to roll Plaintiff onto his stomach. *See id*. Ex. G at 0:13:45. At that time, the officers placed Plaintiff in handcuffs. *See id*. at 0:14:03. Plaintiff provides that during the altercation he was not resisting but simply reacting to the pain and helplessness he was suffering. *See id.* at ¶ JJ. Defendant admitted in deposition that he knew being tased was extremely painful and could not answer whether Plaintiff was able to comply with the officers' orders to turn over. *See id*. at ¶¶ RR, SS.

### D. Disposition of Criminal Charges

Plaintiff was charged with Aggravated Battery Upon a Peace officer (4F) contrary to NMSA 1978, §30-22-25, Battery Upon a Peace Officer (4F) contrary to NMSA 1978 § 30-22-24, and Resisting, Evading or Obstructing an Officer (M) contrary to NMSA 1978 § 30-22-1. UMF

¶ 80, Doc. 49. On September 12, 2018, pursuant to a plea and disposition agreement, Plaintiff entered a guilty plea to the charge of Resisting, Evading or Obstructing an Officer stemming from the March 4, 2018, incident. *See id*. at ¶ 81.

## II.
## PROCEDURAL BACKGROUND

Plaintiff filed his Complaint in the Second Judicial Court in the State of New Mexico, alleging violations of the Fourth Amendment under 42 U.S.C. § 1983. Doc. 1-2. Defendant removed the action to federal court. Doc. 1. After removal, Defendant moved for summary judgment, asserting the defense of qualified immunity. Doc. 49.

## III.
## LEGAL STANDARD

### A. Section 1983 and Qualified Immunity

Title 42 U.S.C § 1983 "allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under the color of state law." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 459 (10th Cir. 2013). In defending, "[i]ndividual defendants named in a § 1983 action may raise a defense of qualified immunity." *Id.* Such immunity "shields public officials … from damages actions unless their conduct was unreasonable in light of clearly established law." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008). Generally, "when a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Cillo*, 739 F.3d at 460; *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016) (citing *Felders ex rel. Smedley v.*

*Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014)) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.") (internal quotation marks and citation omitted).

### B. Summary Judgment

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A fact is material if it can have an impact on the outcome of the lawsuit and genuine if a rational jury could find in favor of the non-moving party based on the evidence presented." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021). In its evaluation, the court must construe the evidence in the light most favorable to [Plaintiff] as the nonmoving party. *See McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir.2010).

However, "[b]ecause of the underlying purposes of qualified immunity, [the Tenth Circuit] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). The onus is first on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019). The first prong depends on whether the facts "taken in the light most favorable to the party asserting the injury show the officer's conduct violated a federal right". *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (citation and punctuation omitted). The second prong requires that preexisting Supreme

Court or Tenth Circuit precedent, or the weight of authority from other circuits, makes it apparent to a reasonable officer that the nature of his conduct is unlawful. *See Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017). A case need not be directly on point for a right to be clearly established because fact-to-fact comparison is not required when distinctions in the facts make no constitutional difference. *See Kerns v. Bader*, 663 F.3d 1173, 1186-87 (10th Cir. 2011). Instead, all that is required is "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, ––– U.S. –––, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (citation omitted).

If a "plaintiff successfully carries his two-part burden," the "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir.1996); *see also Pueblo Neighborhood Health Cntrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir.1988).

## IV.
## DISCUSSION

Plaintiff concedes that the initial takedown and first use of the taser were justified, however, Plaintiff argues that after the first tasing, the subsequent six tasings were constitutionally excessive under clearly established law. According to Plaintiff, a reasonable officer on the scene would have known that after the first tasing, Plaintiff was no longer resisting and effectively subdued. Doc. 52.

### A. Constitutional Violation

The Court evaluates excessive force claims under an "objective reasonableness" standard, judged from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). In conducting that analysis, the Court "focuses not on the officers' particular

motivations, nor on the arrestee's perception of the intrusion, but on whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009). Reasonableness is evaluated under the totality of the circumstances and includes the consideration of the following factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of officers or others; (3) and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

### 1. Severity of the crime at issue

The first *Graham* factor, being "the severity of the crime at issue," weighs against the use of anything but minimal force in this case. Plaintiff correctly argues that an officer's use of force on a subject who is not resisting or who is effectively subdued is unconstitutional regardless of the suspected crime or conduct. *Perea v. Baca*, 817 F.3d 1198, 1204-05 (10th Cir. 2016) ("And our precedent is clear that continued force after an individual has been subdued is a violation of the Fourth Amendment."). However, because the Court must evaluate the totality of the situation and judge the circumstances confronting the officers during the entire encounter, the severity of the crime at issue is relevant throughout the entire altercation. Even though Plaintiff has conceded that the initial takedown and first use of the taser were constitutionally permissible, the following six uses must still be evaluated within the *Graham* framework.

#### a. Officers did not have sufficient evidence to suspect Plaintiff of Breaking and Entering.

The initial dispatch call reported that "a Hispanic male [who] tried to make entry, was circling the hotel, and appeared 'high.'" UMF ¶ 2, Doc. 49. Defendant argues that the information relayed from dispatch gave officers reasonable suspicion for the fourth degree felony crime of Breaking and Entering contrary to NMSA 1978, § 30-14-8. Defendant also provides that, prior to

10

any force being applied, communication with dispatch confirmed three outstanding arrest warrants for felony probation violations. UMF ¶ 23, Doc. 49. Additionally, the ensuing struggle and escalation gave officers probable cause for the crime of Resisting, Evading, or Obstructing an officer contrary to NMSA 1978 § 30-22-1 (1981), and Battery on a Peace Officer pursuant to NMSA 1978 § 30-22-24 (1971).

However, Plaintiff argues, and the Court agrees, that the information received by officers did not support any suspicion that Plaintiff had committed the crime of Breaking and Entering. Breaking and Entering requires, "unauthorized entry of…dwelling or structure…where entry is obtained by fraud or deception, or by the breaking or dismantling of any part of the…dwelling or other structure, or by the breaking or dismantling of any device used to secure the dwelling or other structure." NMSA 1978 § 30-14-8(A). The information relayed to officers did not give them any reason to suspect that unauthorized entry was obtained by fraud, breaking or dismantling. Defendant may have suspected "attempted" breaking and entering which is a misdemeanor pursuant to NMSA 1978 § 30-28-1 (D) ("if the crime attempted is a fourth degree felony, the person committing such attempt is guilty of a misdemeanor."). Thus, at most, officers had suspicion that Plaintiff committed a misdemeanor offense. *See Lee v. Tucker*, 904 F.3d 1145 (10th Cir. 2018) ("The district court's analysis was consistent with the many cases in which we have held that the first *Graham* factor may weigh against the use of significant force if the crime at issue is a misdemeanor.").

### b. Warrants for probation violations are not "severe crimes."

Beyond the suspected misdemeanor of attempted Breaking and Entering, Defendant urges the Court to consider Plaintiff's active arrest warrants for probation violations. The Court notes that active warrants are not crimes but simply court orders directing officers to apprehend

11

Case 1:21-cv-00258-DHU-KK   Document 79   Filed 03/08/23   Page 12 of 17

someone. Therefore, the existence of warrants alone cannot justify a high level of force, if any. *See Harris v. Janes*, 820 Fed.Appx. 677, fn. 4 (10th Cir. 2020) (finding that the first *Graham* factor, "severity of the crime at issue," supported the conclusion that force used was excessive because Plaintiff's probation violation was not "severe" enough to justify the level of force used).

### c. Resisting, Evading, or Obstructing an officer is a misdemeanor offense.

Pursuant to agreement, Plaintiff entered a guilty plea to the charge of Resisting, Evading or Obstructing an Officer, stemming from the incident now before the Court. UMF ¶ 81, Doc. 49. Pursuant to NMSA 1978 § 30-22-1, "[w]hoever commits resisting, evading or obstructing an officer is guilty of a misdemeanor." Where officers are reacting to a misdemeanor, the "amount of force should be reduced accordingly." *Lee,* 904 F.3d at 1149. The Court is not intending to belittle the offense of resisting, evading, or obstructing an officer, but rather note, that the crime remains a misdemeanor by statute. As such, the commission of a misdemeanor supports the use of nothing more than minimal force, if any. *See Fisher*, 584 F.3d at 895.

Defendant urges the Court to consider his probable cause to suspect the felony of Battery Upon a Peace Officer contrary to NMSA 1978 § 30-22-24. Defendant argues that Plaintiff bit both Defendant and Officer Hawkins during the altercation. However, a question of fact precludes the Court from considering this allegation. In evaluating the facts of the case, the Court must construe the evidence in the light most favorable to the non-moving party. Here, Plaintiff claims that he did not bite either officer. Because the lapel footage is ambiguous and Defendant has provided no evidence under oath to blatantly contradict the record, we take Plaintiff's assertion as true. *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1165 (10th Cir. 2021) ("We must also decline to extend the exception where the source of the contradictory testimony is the defendant himself.") (citation omitted). Because the video evidence is unclear, and the Court cannot rely on Defendant's

12

own accounts of the events, the Court will not consider the allegations regarding Plaintiff's battery upon either Defendant or Officer Hawkins. Therefore, the Court is left to only consider Plaintiff's misdemeanor charge of Resisting, Evading or Obstructing an Officer.

### 2. Threat to the safety of officers or others

The second *Graham* factor, whether Plaintiff posed an immediate threat to the safety of officers or others, similarly weighs against Defendant. The Tenth Circuit has noted that the second *Graham* factor "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Vette*, 989 F.3d at 1170 (citation omitted). In evaluating this factor, the Court "must look at whether officers [or others] were in danger at the precise moment that they used force." *Emmett v. Armstrong*, 973 F.3d 1127, 1136 (10th Cir. 2020) (citation omitted). Under the version of facts that the Court must take as true at summary judgement, Plaintiff did not pose an immediate threat to Defendant or anybody else.

It is undisputed that Plaintiff was unarmed. UMF ¶ A, Doc. 52. Even if justification for some use of force existed prior to Plaintiff's arrest, justification based on dangerousness disappears whenever Plaintiff becomes under an officer's control. *Vette*, 989 F.3d at 1170; *see also Perea*, 817 F.3d at 1204 ("Even if [Plaintiff] initially posed a threat to the officers that justified tasering him, the justification disappeared when [Plaintiff] was under the officers' control."); *Emmett*, 973 F.3d at 1136 ("However, when [officer] tackled [plaintiff], he had effectively neutralized any safety concerns arising from [plaintiff's] flight."). Under these circumstances, Plaintiff posed minimal threat at the moment Defendant initially used force against him, and each subsequent use of force must be evaluated individually. A factual dispute exists as to whether Plaintiff was under officers' control. However, with facts taken in the light most favorable to the Plaintiff, the significant use of force by Defendant exceeded Plaintiff's minimal safety threat.

### 3. Resistance, or attempt to evade arrest by flight

The third *Graham* factor, whether Plaintiff resisted, or tried to evade arrest by flight, weighs in favor of the use of some force at the outset of the encounter during the period in which Plaintiff was resisting. However, "the relevant inquiry is whether the taser use was reasonable and proportionate given [Plaintiff's] resistance." *Perea*, 817 F.3d at 1203 (citation omitted). "The Fourth Amendment permits increased force when a subject is attempting to run away and thereby evade capture." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007). The excessive force inquiry "evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007). Plaintiff concedes that the initial "takedown" and first use of the taser were justified. Doc. 52 at 12-13. However, Defendant's continued use of force requires the Court to separately analyze each subsequent use of force, at the time it was used. *See Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (concluding officer lacked justification to believe plaintiff posed a threat of serious harm to the officer or others at the time he fired shots two through seven).

There is a factual dispute as to when Plaintiff was effectively subdued. In evaluating the lapel footage, and taking all facts and reasonable inferences in the light most favorable to Plaintiff, the Court notes that officers on scene never informed Plaintiff that he was under arrest. AMF ¶¶ H–I, Doc. 52. After the first tasing, Plaintiff claims that he began to comply with officer commands physically and verbally. Plaintiff can be heard responding to officer commands by saying "okay," and "alright." AMF ¶¶ FF, HH, OO, Doc. 52. It is apparent that Plaintiff struggled to complete officer commands due to physical restraints—namely being asked to roll over under the weight of

Officer Hawkins and attempting to put his hands behind his back while they were being pinned to the ground. However, before Plaintiff was eventually cuffed he was tased an additional six times—a level of force that the Court certainly finds significant. It should also be noted that being tased is "extremely painful." AMF ¶ RR, Doc. 52. Being tased will undoubtedly cause a natural response to stimuli, and cause movement that is likely to take precedent over the officer's commands. Here, lapel footage depicts Plaintiff's natural physical reactions to the extreme pain of being tased. At various times during the altercation, Plaintiff is seen reaching for the areas where he had just been tased, many of which were aimed at Plaintiff's "upper thigh" and groin area.

Although the use of some force against a resisting arrestee may be reasonable, continued and increased use of force against a subdued individual is not. *See Casey*, 817 F.3d at 1203. Here, the *Graham* factors dictate that Defendant's treatment was not reasonable for a misdemeanant who was a minimal threat, effectively subdued, and who was not attempting to flee. *See Casey*, 509 F.3d at 1282. A reasonable jury could find that the repeated use of a taser against Plaintiff was unreasonable and constitutes excessive force under the Fourth Amendment.

### B. Clearly Established Law

Next this Court considers whether Defendant's actions violated clearly established law. "For a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (citation and quotation marks omitted). However, the qualified immunity analysis involves more than "a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Vette*, 989 F.3d at 1171-72 (citation omitted). "The salient question is whether the state of the law

15

at the time of an incident provided "fair warning" to the defendants that their alleged conduct was unconstitutional." *Tolan*, 572 U.S. at 656.

At the time of the events giving rise to this lawsuit, it was clearly established law in the Tenth Circuit "that officers may not continue to use force against a suspect who is effectively subdued." *Perea*, 817 F.3d at 1204 (referencing *Fancher*, 723 F.3d at 1201). Additionally, the "use of force, including a taser, against a suspect who committed only a nonviolent misdemeanor, and who did not struggle against officers until officers employed force, was unlawful." *Id.* (citing *Casey*, 509 F.3d at 1281). And further, "the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Id.* (citing *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008)). Whether an individual has been subdued from the perspective of a reasonable officer depends on the officer having "enough time to recognize that the individual no longer poses a threat and react to the changed circumstances." *McCoy v. Meyers*, 887 F.3d 1037, 1048 (10th Cir. 2018) (citing *Fancher*, 723 F.3d at 1201).

Although the precise moment Plaintiff became subdued is in dispute, a reasonable jury could find that Defendant failed to recognize when Plaintiff no longer posed a threat, and that he failed to react to the changing circumstances. The Tenth Circuit precedent is clear that continued use of force after an individual has been subdued is a violation of the Fourth Amendment. Here, with the facts before the Court, a reasonable fact finder could conclude that Defendant continued to taser Plaintiff after he no longer posed a threat such that he was effectively subdued.

## V.
## CONCLUSION

For the foregoing reasons, the Court finds that Defendant is not entitled to qualified immunity as it pertains to Plaintiff's § 1983 claim for excessive force.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgement for Dismissal of Excessive Force Claim, Doc. 49, is **DENIED**.

_____
**DAVID HERRERA URIAS**
**UNITED STATES DISTRICT JUDGE**